UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

GREGORY SMITH, Individually and on
Behalf of All Others Similarly Situated,

                              Plaintiff,

      vs.

BP PLC, ROYAL DUTCH SHELL PLC,
STATOIL ASA and JOHN DOE NOS. 1-50,

                           Defendants.

—————————————————————— x

13 CV 3944

Civil Action No. _____

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF THE
COMMODITIES EXCHANGE ACT AND
FEDERAL ANTITRUST LAWS

DEMAND FOR JURY TRIAL

RECEIVED
JUN 10 2013
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Gregory Smith ("Plaintiff"), individually and on behalf of a Class of all others similarly situated, brings this action for damages and relief against BP Plc ("BP"), Royal Dutch Shell Plc ("Shell") and Statoil ASA ("Statoil") (collectively, "Defendants"), for violations of the Commodity Exchange Act ("CEA"), violations of federal antitrust laws (the "Sherman Act" and "Clayton Act") and for unjust enrichment. Based on counsel's investigation, research and review of publicly available documents, on Plaintiff's personal knowledge, and upon information and belief, Plaintiff alleges as follows:

## INTRODUCTION

1.      This action alleges a conspiracy among Defendants to fix, raise, maintain and/or artificially inflate prices in restraint of trade in, and intentional manipulation of, the market for North Sea Brent Crude Oil ("Brent Crude Oil") and the prices of Brent Crude Oil futures contracts traded on the New York Mercantile Exchange ("NYMEX") and the Intercontinental Exchange ("ICE") from at least 2002 through the present (the "Class Period"). Defendants intentionally reported inaccurate, false and deceptive information regarding Brent Crude Oil prices to Platts, a division of McGraw Hill Financial Inc. ("McGraw Hill"), the world's leading energy information and price reporting company, in order to reap the profits of artificially inflated and manipulated Brent Crude Oil prices. Platts is the "premier source of benchmark price assessments for commodity markets," including assessments of the underlying "spot" price for Brent Crude Oil, which serves as the basis for all pricing in the physical and derivatives (including futures) Brent Crude Oil markets.

2.      The physical market for Brent Crude Oil includes oil bought or sold under long-term agreements ("term" agreements), and the residual, referred to as the "marginal barrel," is bought or sold on the spot market. Platts's spot benchmark price assessments of Brent Crude Oil are used to price and settle spot and term agreements on a physical basis, and to settle Brent Crude Oil derivatives contracts, including NYMEX and ICE Brent Crude Oil futures contracts. Reporting false

and deceptive Brent Crude Oil prices to Platts therefore undermines the entire pricing structure for Brent Crude Oil.

3.      Defendants have market power and the ability to influence prices in the market for North Sea Brent Crude Oil and Brent Crude Oil futures contracts as leading producers and market participants in the Brent Crude Oil market.   By intentionally reporting inaccurate, deceptive, collusively set and/or false Brent Crude Oil pricing information to Platts, Defendants manipulated and restrained trade in both the physical and futures Brent Crude Oil markets.

4.      Last year the International Organization of Securities Commissions ("IOSCO"), an umbrella body of the world's securities' regulators, concluded that the current Platts price benchmarking system "***creates the opportunity to manipulate the commodity market***," and warned that the potential for misconduct in the oil market "is not mere conjecture."   Similarly, in breaking with the physical trading industry's code of silence, Total Oil Trading SA ("Total Oil"), the Swiss trading arm of France's Total SA, one of the world's largest oil companies, told regulators in an August 2012 letter that "***several times a year, estimates of market prices on key [energy] indices . . . are out of line with our experience of the day,***" warning of "***inaccurate pricing.***"

5.      Nine months later, on May 14, 2013, the European Commission ("EC") announced that EC officials, along with their counterparts in the EFTA Surveillance Authority and a national competition authority, had carried out unannounced inspections of several companies active in and providing services to the crude oil, refined oil products and biofuels sectors.   The raids were based on concerns that "the companies may have colluded in reporting distorted prices to a price reporting agency to manipulate the published prices for a number of oil and biofuel products," and that the companies may have prevented others from participating in the price assessment process in order to distort published prices.   Such conduct, the EC reasoned, could amount to violations of "antitrust

- 2 -

rules that prohibit cartels and restrictive business practices and abuses of a dominant market position." The EC noted that the prices assessed and published by price reporting agencies serve as benchmarks for trade in the physical and financial derivative markets for numerous commodity products globally. It concluded by cautioning that, "*[e]ven small distortions of assessed prices may have a huge impact on the prices of crude oil . . . potentially harming financial consumers.*"

6.      The very same day of the EC's announcement, Defendant Statoil confirmed that the scope of the investigation was related to the Platts market-on-close price assessment process, used to report prices for crude and refined oil products and biofuels, extending back to as early as 2002. Statoil stated that authorities suspected participation by several companies, including Statoil, "in anti-competitive agreements and/or concerted practices," and that the investigation related to "potential abuse of possible dominant position by another party." At the same time, Platts confirmed that the EC had "undertaken a review at its premises in London" in relation to the Platts price assessment process. Shell and BP also confirmed that they were subjects of an investigation.

7.      On May 17, U.S. Senator Ron Wyden, Chairman of the Senate's energy committee, asked the Justice Department to join the probe into potential oil market manipulation. Senator Wyden acknowledged that "because of the interrelationships among world oil markets and hedging practices," efforts to manipulate oil indices may have already impacted the U.S. market.

8.      Plaintiff expects these investigations to yield information from Defendants' records (including emails, instant messages, Brent Crude Oil trading data and other communications, etc.) that provide further support for Plaintiff's claims. Plaintiff believes that further evidentiary support for the allegations set forth herein will be uncovered after a reasonable opportunity for discovery.

9.      As a result of Defendants' conspiratorial conduct and intentional manipulation of the Platts Brent Crude Oil benchmark price reporting process, Plaintiff and Class members who

transacted in Brent Crude Oil futures contracts during the Class Period transacted at artificially inflated and manipulated prices while Defendants reaped the benefits.

## JURISDICTION AND VENUE

10.     This action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. §§1 and 2, Sections 4 and 16 of the Clayton Act, and Section 22 of the CEA, 7 U.S.C. §25.

11.     Brent Crude oil is a "commodity" and is the "commodity underlying" the Brent Crude Oil futures contracts traded on the NYMEX and ICE, as those terms are defined and used in Sections 1 and 25 of the CEA, 7 U.S.C. §§1a(9) and 25(a)(1)(D), respectively.

12.     This Court has jurisdiction over this action pursuant to Section 25 of the CEA, 7 U.S.C. §25(c), Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26(a), and 28 U.S.C. §§1331 and 1337, respectively.  This Court also has jurisdiction over the state law claim under 28 U.S.C. §1367 because that claim is so related to the federal claim that it forms part of the same case or controversy, and under 28 U.S.C. §1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

13.     Venue is proper in the Southern District of New York, pursuant to Section 25 of the CEA, 7 U.S.C. §25(c), Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391(b), (c) and (d).  One or more of the Defendants resided, transacted business, was found, or had agents in the District, and a part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

14.     The NYMEX is located in this District at One North End Avenue, New York, New York.  Further, Platts's global headquarters are located in New York, New York.  Platts is a division of McGraw Hill Financial Inc., which is also headquartered in New York, New York.  The Brent

Crude Oil prices published and compiled by Platts are widely disseminated in the U.S. to Brent Crude Oil spot and futures traders, including Plaintiff, located in the U.S.

## PARTIES

15.    Plaintiff Gregory Smith is an individual residing in the State of Texas.  Plaintiff traded Brent Crude futures contracts during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein.  Plaintiff was deprived of transacting in a lawful, non-manipulated, competitive market in Brent Crude Oil futures. Specifically, Plaintiff has been injured by paying artificial and anticompetitive prices for Brent Crude Oil futures contracts as a direct and proximate result of Defendants' unlawful conduct alleged herein.

16.    Defendant BP Plc ("BP") is a multinational oil and gas company headquartered in London, England, United Kingdom.  BP maintains offices in the United States, including in Houston, Texas, Naperville, Illinois and Anchorage, Alaska.

17.    Defendant Royal Dutch Shell Plc ("Shell") is a multinational oil and gas company headquartered in The Hague, Netherlands.  Shell maintains offices in the United States, including in Houston, Texas.

18.    Defendant Statoil ASA ("Statoil") is a Norwegian oil and gas company, formed by the 2007 merger of Statoil with the oil and gas division of Norsk Hydro.  Statoil maintains offices in the United States, including in Stamford, Connecticut, Washington, D.C. and Houston, Texas.

19.    John Doe Defendants Nos. 1-50 are other entities or persons, including oil, gas or other energy companies as well as other co-conspirators whose identities are currently unknown to Plaintiff.  The John Doe Defendants participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, collusion and manipulation of the prices for Brent Crude Oil and Brent Crude Oil futures contracts.

- 5 -

## CO-CONSPIRATORS, AGENTS AND AIDERS AND ABETTORS

20.    During the Class Period, various other entities and individuals, including, but not limited to, agents or other persons or entities acting for Defendants or for any other co-conspirators, and persons or entities that have willfully aided, abetted, counseled, induced or procured the manipulation of Brent Crude Oil prices, participated as co-conspirators in the unlawful conduct alleged in this complaint and performed acts and made statements in furtherance thereof.  In particular, certain individuals and entities agreed and conspired to intentionally report inaccurate, misleading and false information regarding Brent Crude Oil prices to Platts in order to increase Defendants' and their co-conspirators' prices to the detriment of Plaintiff and the Class.  All averments herein against named Defendants are also averred against these unnamed co-conspirators as though set forth at length.

## INTERSTATE TRADE AND COMMERCE

21.    Defendants' activities, as described herein, were within the flow of, and substantially affected, interstate commerce.  Specifically, Brent Crude Oil and Brent Crude Oil futures contracts are each a commodity that trades in U.S. interstate commerce.  Defendants' collusive conduct regarding, and manipulation of, Brent Crude Oil and Brent Crude Oil futures contract prices had direct, substantial and reasonably foreseeable effects in the U.S., and on Plaintiff and members of the Class. Brent Crude Oil futures contracts are traded on the NYMEX and domestically on electronic boards of trade and on exchanges, such as ICE, accessible within the U.S.  Defendants, as sophisticated Brent Crude Oil market participants, knew, or had good reason to know, that Brent Crude Oil prices published and compiled by Platts, are disseminated in the U.S., and are used to price, settle, and benchmark Brent Crude Oil futures contracts and/or other Brent Crude Oil derivative contracts traded in the U.S.

- 6 -

22.     For these reasons, Defendants knew, or had good reason to know, that misreporting the price of Brent Crude Oil to Platts, as well as engaging in other manipulative and collusive conduct in the Brent Crude Oil market, would, and did, have direct, substantial and reasonably foreseeable effects in the United States, including, without limitation, on the prices of Brent Crude Oil futures contracts transacted domestically.

## FACTUAL ALLEGATIONS

### Background of Oil Trading Structures

23.     Crude oil is processed at refineries and transformed into finished oil products. By and large, crude oil production and refining are not fully integrated and refiners engage in trade to secure supplies for their facilities or to dispose of surpluses. Because the volumes of oil sold each day are so large, oil companies typically sell or buy most of their oil under long-term contracts. As a result, approximately 90-95% of all crude oil and oil products are sold under "term" contracts. The balance, also referred to as the marginal barrel, is bought or sold on the spot market, which is typically defined as a one-off deal between counterparties for a physical commodity.

24.     Spot and term oil can be sold on a fixed price basis or on a "floating" basis. Floating price deals are overwhelmingly the norm because they are less risky. For example, if it takes 25 days for a cargo of crude oil from a producer to reach a refiner, if the refiner bought the oil at a fixed price, she would face a potentially large financial loss if prices fell by the time the oil was delivered. If the refiner buys crude oil on a floating price basis tied to the value of the oil when it is delivered to his refinery and sells the oil products on a floating basis, the price risk that she faces is reduced.

25.     A variety of derivative instruments are available that allow people to lock in or hedge a price for oil deliveries in the future, including forwards, futures, options and swaps.

**The Underlying Brent Crude Oil Physical Market**

26.     "Brent Crude" is a major trading classification of sweet light crude oil comprising of Brent Blend, Forties Blend, Oseberg and Ekofisk crudes, and is sourced from the North Sea. Together, Brent, Forties, Oseberg and Ekofisk are known to crude oil traders as the Brent Crude market or "BFOE." Brent is the leading global price benchmark for Atlantic basin crude oils and it is used to price two-thirds of the world's internationally traded crude oil supplies.

27.     The spot market for Brent Crude Oil, or "dated Brent," refers to the sale of a specific cargo that is either available in a specific loading slot or that is already loaded and in transit to some destination. Platts describes dated Brent as a rolling assessment that reflects the price of physical, "wet" Brent cargos loading no less than ten days forward. Brent is also a market term for a cargo of North Sea Brent Crude Oil that has been assigned a date when it will be loaded onto a tanker.

28.     Conversely, cargoes that have not been assigned a date are known as paper barrels or "cash Brent" and are traded for speculative or hedging purposes. Cargoes from a "cash" contract month are progressively "dated" or "wetted," until the 25th day before the end of that delivery month, at which point all cargoes for that delivery month must become "dated." Cash cargoes become dated cargoes when they have been assigned a date to be loaded onto a tanker. The cash BFOE cargoes trade in chains between potential users of the physical oil until it becomes a "dated" cargo.

**The Brent Crude Oil Futures Market**

29.     One of the derivative instruments available to traders in the Brent Crude Oil market is a futures contract. A futures contract is an agreement to buy or sell a commodity and deliver that item at a certain date in the future. The party selling the commodity and obligated to deliver the commodity on the delivery date is called the "short," and is said to hold a "short position" on a

futures contract. The buyer, who is obligated to accept delivery of the commodity, is the "long" and holds a "long position" on a futures contract.

30.     In the context of futures trading, a commodity such as Brent Crude Oil is the underlying instrument upon which a bilateral futures contract is based. Brent Crude Oil futures are crude oil contracts between a buyer and seller based on the light sweet North Sea crude oil that serves as an international benchmark grade.

**Brent Crude Oil Futures Traded on the New York Mercantile Exchange**

31.     The NYMEX is a designated contract market under Section 7 of the CEA, 7 U.S.C. §7. NYMEX is the world's largest physical commodity futures exchange and the preeminent forum for energy futures. Its operations are regulated by the Commodities Futures Trading Commission ("CFTC"). NYMEX futures contracts priced, settled or benchmarked to Brent Crude Oil include: (1) the "Brent Crude Oil Last-Day Futures" (traded as "BZ"); (2) "Brent Financial Futures" (traded as "CY"); and (3) "Brent Crude Oil Futures" (traded as "BB"). The contract unit size of each of these futures is, respectively, 1,000 barrels.

32.     These contracts are transacted electronically on the Chicago Mercantile Exchange ("CME") Globex and CME ClearPort trading platforms. Additionally, the Brent Crude Oil Last-Day Futures and the Brent Financial Futures trade through open outcry at the NYMEX in New York. Open outcry is a method of public auction for making bids and offers in the trading pits of the futures exchange. Globex is an electronic trading platform owned by the NYMEX's parent company, the CME Group.

33.     Trading in NYMEX Brent Crude Oil Last-Day Futures, Brent Financial Futures, and Brent Crude Oil Futures is subject to the rules and regulations of the NYMEX, and prices are quoted in U.S. dollars and cents per barrel. The CME Group website describes the three Brent Crude Oil

futures contracts in detail, including termination of trading and settlement terms, as discussed in further detail below.

34.     Trading in the NYMEX Brent Crude Oil Last-Day Futures terminates on the same termination day as the ICE Brent Crude Oil futures contract for the delivery month, *i.e.*, on the business day immediately preceding the fifteenth day prior to the first day of the delivery month, if such fifteenth day is a banking day in London.  If the fifteenth day is a nonbanking day in London (including Saturday), trading shall cease on the business day immediately preceding the first business day prior to the fifteenth day.  Final settlement for the Brent Crude Oil Last Day Futures is based on its "Floating Price."  The Floating Price is equal to the ICE Brent Crude Oil Index price as published one day after the final trading day of the contract month.

35.     Trading in the NYMEX Brent Financial Futures terminates on the last business day of the contract month.  Final settlement for the Brent Financial Futures is based on its Floating Price.  The Floating Price is equal to the arithmetic average of the Brent Crude Oil (ICE) Futures 1st nearby contract (discussed, *infra*) settlement prices for each business day that it is determined during the contract month.  The settlement price of the 1st nearby contract month will be used except on the last day of trading for the expiring Brent Crude Oil Futures contract when the settlement price of the 2nd nearby Brent Crude Oil Futures contract will be used.

36.     Trading in the NYMEX Brent Crude Oil Futures terminates on one business day prior to the termination of the ICE Brent futures contract, *i.e.*, two business days before the fifteenth calendar day prior to the first day of the delivery month, if the fifteenth calendar day is not a holiday or weekend in London. If the fifteenth calendar day is a holiday or weekend in London, trading shall end three business days prior to the last business day preceding the fifteenth calendar day.  Final settlement for the Brent Crude Oil Futures contract is based on its Floating Price.  The Floating Price

is equal to the Brent Crude Oil (ICE) Futures 1st nearby contract settlement price on the penultimate trading day for the delivery month.

**Brent Crude Oil Futures Traded on the Intercontinental Exchange**

37.    The International Petroleum Exchange ("IPE") was a London-based energy futures and options exchange dealing predominantly in commodities relating to energy.  IPE was best known for Brent Crude, a world benchmark for oil prices.  The Intercontinental Exchange ("ICE") acquired IPE in 2001.  Brent Crude Oil futures contracts were traded via open outcry on the floor of the IPE until April 7, 2005, when its name was changed to ICE Futures and all trading in Brent Crude Oil futures was shifted onto an electronic trading platform.  Today, ICE Futures is the second largest regulated energy futures exchange in the world.  ICE Futures hosts more than 50% of the world's crude and refined oil futures trading, and the ICE Brent Crude futures contract is relied upon to price two-thirds of the world's physical oil.  ICE Futures is regulated by the U.K. Financial Conduct Authority, with oversight by the CFTC for ICE contracts "linked" to a CFTC-regulated exchange contract.

38.    ICE Brent Crude Oil futures contracts are traded at ICE Futures Europe and executed on the WebICE trading platform, which is distributed in more than 70 countries, including the United States.  These contracts are deliverable based on "exchange for physical" ("EFP") delivery with an option to cash settle, *i.e.*, the ICE Brent Index price for the day following the last trading day of the futures contract.

39.    One ICE Brent Crude Oil futures contract equals 1,000 barrels.  Prices of the contract are quoted in U.S. dollars and cents per barrel.  Trading in ICE Brent futures contracts terminates at the end of the designated settlement period on the business day (a trading day which is not a public holiday in England and Wales) immediately preceding: (1) either the fifteenth day before the first

day of the contract month, if such fifteenth day is a business day; or (2) if such fifteenth day is not a business day, the next preceding business day.

40.     The ICE Brent Crude Oil futures contract was developed in 1988 when the Brent Crude Oil physical market was trading on a fifteen day basis. The expiry calendar established at that point, which continues today for existing ICE Brent futures, reflected the fifteen day timetable. Existing ICE Brent crude oil futures therefore currently expire ten days after BFOE contracts have started to go "wet," *i.e.*, to turn into specific dated Brent contracts with respect to the contract delivery month in question.

41.     According to ICE, "[t]he ICE Brent futures contract is based on the underlying physical BFOE (Brent-Forties-Oseberg-Ekofisk) market. . . . The ICE Brent futures contract is linked to forward BFOE contracts and hence the underlying Dated Brent market by the Exchange for Physical (EFP) mechanism. The contract settles against the ICE Brent Index price for the day following the last trading day of the Brent futures contract. At expiry of a Brent futures contract, the index price is based on the average value of BFOE cash cargoes on expiry day. The index is also calculated by the exchange every day."

42.     Further, "[t]he cash settlement price for ICE Brent . . . is based on the ICE Brent Index at their respective expiries. The index represents the average price of trading in the 25-day 'cash' BFOE market in the relevant delivery month as reported and confirmed by the industry media [Platts] . . . The index is calculated by the Exchange as an average of the following elements: (1) A weighted average of first month cargo trades in the 25-day BFOE market. (2) A weighted average of second month cargo trades in the 25-day BFOE market plus a straight average of the spread trades between the first and second months. (3) A straight average of designated assessments published in media reports [Platts]."

- 12 -

43.     In response to Platts extending its assessment period to 10-25 days, ICE launched the ICE Brent NX (New Expiry) Brent futures contract, which has an expiry calendar based on the 25-Day BFOE market and therefore aligns the futures expiry calendar with the physical BFOE market.

44.     On November 12, 1999, the CFTC granted IPE permission to make its electronic trading and order matching system, known as Energy Trading System II ("ETS"), available to IPE members in the United States.  Specifically, the CFTC stated in a "no-action" letter that it would not recommend that the CFTC institute enforcement action against IPE (acquired by ICE in 2001) or its members solely based upon IPE's failure to obtain "contract market" designation pursuant to Sections 5 and 5a of the CEA, if: (1) IPE members trade through ETS in the United States; (2) IPE members who are registered with Commission as futures commission merchants ("FCMs") (or who are exempt from registration under Rule 30.10 ("Rule 30.10 firms") submit orders from United States customers for submission to ETS; and/or (3) IPE members registered with the Commission as FCMs (or Rule 30.10 firms) accept orders through United States automated order routing systems from United States customers for submission to ETS.

45.     The November 12, 1999 IPE no-action letter was amended by the CFTC four times between July 26, 2002 and April 14, 2003 as trading of the contracts was transitioned from the ETS to ICE platform operated by the IntercontinentalExchange, Inc. in Atlanta, Georgia and trading hours were extended.   The April 14, 2003 amendment letter confirmed that the CFTC would not recommend instituting an enforcement action against IPE or its members solely based upon IPE's failure to seek "contract market" designation or registration as a derivatives transaction execution facility under Sections 5 and 5a of the CEA if IPE made all of its current contracts, including Brent Crude futures, available in the U.S. on the ICE Platform during the course of the entire trading day.

46.     An August 20, 2009 CFTC "no-action" amendment letter stated that "ICE Futures Europe's listing for trading by direct access from the U.S. contracts which settle on the prices of contracts traded on a CFTC-regulated exchange . . . . create a single market for the subject contracts. . . .  Because of the linkage, the trading of financially-settled contracts on ICE Futures Europe affects the pricing of physically-settled contracts traded on NYMEX."

**Platts's Benchmark Price Assessments Play
a Central Role in the Brent Crude Oil Market**

47.     Platts, a division of the New York-based McGraw Hill, publishes benchmark prices that are used to determine the costs refiners pay for crude oil and distributors pay for diesel fuel and gasoline.  Traders report transactions to Platts.  Those reported deals, rather than a complete record of all trades, are used to determine the price.  Platts's published dated Brent prices serve as the leading global benchmark for Brent Crude Oil.

48.     Almost all physical BFOE crude oil is traded in the over-the-counter ("OTC") market, where the transaction details are not readily observable.  As a result, Platts plays the central role in establishing and reporting spot prices of Brent Crude Oil.

49.     Platts uses a "market-on-close" methodology in establishing and reporting Brent crude oil spot prices.  Platts's market-on-close methodology is based upon bids, offers and transactions for spot Brent Crude Oil (as reported to Platts) that take place during the 30 to 45 minutes before the close of the market (generally 4:00 p.m. to 4:30 p.m. London time).  This 30-45 minute period of time is referred to as the "Platts window."  Market participants can adjust their bids and offers during the Platts window subject to Platts's guidelines.  Market participants who failed to declare their intention to submit bids and offers during the Platts window may not submit bids and offers during the Platts window, but may still choose to accept a bid or an offer posted during the Platts window.  Following the close of the market (generally 4:30 p.m. London time),

Platts's editors examine the bids, offers, and transactions for spot Brent Crude Oil that took place during the Platts window and use that data to establish an end-of-day (or market-on-close) Brent Crude Oil spot price. Platts subscribers have access to the real-time trading data published by Platts during the market-on-close process.

50.     Although participation in Platts's market-on-close is voluntary, Platts is highly selective as to which market participants are permitted to participate in its market-on-close process. However, upon information and belief, Platts relies heavily on prices and other information provided to it by Defendants in determining benchmark Brent Crude Oil prices.

51.     In 2002, Platts extended the date range reflected in its daily Platts dated Brent price assessment to 21 days forward. As of January 2012, Platts amended the date range reflected in its daily Platts dated Brent price assessment to 10-25 days forward, instead of the then-current 10-21 days forward. Platts undertook this measure given certain pipeline system disruptions and cargo delivery shortfalls to "maintain the strength of the psychical benchmark." The additional four delivery days would purportedly allow the assessment process to capture more than 30% of additional supply.

52.     IOSCO, the international body of world securities regulators, stated in an October 2012 report that price assessments such as the Brent Crude Oil benchmark could be vulnerable to manipulation because traders participate voluntarily, meaning they may selectively submit only trades that benefit their positions. Total Oil, an arm of the French oil company Total SA, said in a submission to IOSCO that the published oil price is wrong "several times a year." Consequently, the EC investigation initiated on May 14, 2013 is based on concerns that Defendants colluded in reporting distorted prices to Platts with the intention of manipulating the published prices for certain oil products for their own financial gain.

**Brent Crude Oil Spot and Futures Contract Prices Are Directly
Linked and Susceptible to Collusion and Manipulation by Defendants**

53.     The Brent Crude oil futures market can be thought of as a clearinghouse for trades among buyers and sellers of Brent Crude Oil futures contracts, which are standardized contracts used to price Brent crude oil at various maturities.  The Brent Crude Oil futures market is inextricably linked to, and associated with, the spot market for Brent Crude Oil, and consequently to Platts pricing.  Therefore, price movements in the spot market can and do cause price movements in the futures markets.

54.     Brent Crude Oil futures prices derive their valuation from spot transactions.  In particular, Brent Crude Oil futures traders refer to the spot prices published by the reporting firms, such as Platts, for price discovery and for assessing price risks in the Brent Crude Oil market.  An increase in the spot price published by Platts, signals either stronger demand or weakened supply, and futures traders take account of both price movements and changes in the supply/demand balance when conducting their futures trading.  This price impact is expected.  Brent Crude Oil futures overlay the conventions and conditions of the Brent Crude Oil spot market.

55.     The spot market is the first point in a commercial transaction. Brent Crude Oil spot and futures prices move in the same direction, which is why people use futures markets to hedge price exposure. This is just another way of expressing the integrated characteristics and consequent arbitrage realities of Brent Crude Oil.  What happens in the Brent Crude Oil spot market by definition affects Brent Crude Oil futures.  The expiration of a Brent Crude Oil futures contract into a physical position, also results in the convergence of price especially when the spot price sets the futures expiration price. The physical delivery mechanism ensures price convergence between the spot and futures market.  When these high correlations or conversions are disrupted by the manipulation of prices (creating false values/ prices), *i.e.*, a manipulation of the Platts Brent Crude

Oil benchmarks, it has effects that flow throughout the Brent Crude Oil market. As noted by the EC, "[e]ven small distortions of assessed prices may have a huge impact on the prices of crude oil . . . potentially harming financial consumers."

**Defendants Collusive and Manipulative**
**Conduct Has Led to Government Investigations**

56.    On May 14, 2013 the EC confirmed that it, along with the EFTA Surveillance Authority and another national competition authority, had carried out unannounced inspections of several companies active in and providing services to the crude oil, refined oil products and biofuels sectors. The European Commission undertook the inspections on concerns that the companies may have colluded in reporting distorted prices to a price reporting agency to manipulate the published prices for a number of oil and biofuel products, and prevented others from participating in the price assessment process, with a view to distorting published prices. As described in the EC's announcement:

> The prices assessed and published by Price Reporting Agencies serve as benchmarks for trade in the physical and financial derivative markets for a number of commodity products in Europe and globally. ***Even small distortions of assessed prices may have a huge impact on the prices of crude oil, refined oil products and biofuels purchases and sales, potentially harming financial consumers.***

[Emphasis added.]

57.    Immediately following the EC's announcement, Defendants BP, Shell and Statoil all confirmed they were the subject of the investigation. In particular, Defendant Statoil confirmed that its office in Stavanger (Norway) was subject to an inspection by the EFTA Surveillance Authority, assisted by the Norwegian Competition Authority. Statoil acknowledged that the inspection was carried out at the request of the EC. Further, Statoil confirmed that the scope of the European Commission's investigation was "related to the Platts' Market-On-Close price assessment process,

used to report prices in particular for crude oil, refined oil products and biofuels" extending back to as early as 2002.

58.    On May 17, 2013, the U.K. Serious Fraud Office announced that it was "urgently reviewing" the European Commission's allegations of price-fixing in the oil markets and determining whether to accept the case for "criminal investigation." That same day, the United States Senate called for the U.S. Department of Justice to join the European Commission investigation.

59.    The EC investigation was far from the first inquiry into Defendants' participation in price fixing and manipulation schemes in energy-related commodities markets. In September 2006, the European Union's antitrust watchdog fined 14 companies $346 million for fixing the price of bitumen, a petroleum byproduct used to make asphalt, over an eight year period on the Dutch market. Shell, whose fine was increased for being a repeat offender, received the biggest penalty.

60.    Price-fixing probes into Defendants' conduct in energy commodities markets have not been confined to European markets. BP agreed to pay $303 million in October 2007 to settle U.S. Commodity Futures Trading Commission allegations relating to claims of market manipulation. In January 2009 a BP unit, Houston-based BP America, agreed to pay $52 million to propane buyers who accused it of trying to monopolize the supply of gas flowing through a Texas pipeline.

**Defendants Collusively Inflated and Intentionally Manipulated Brent Crude Oil Futures Prices by Falsely Reporting Brent Crude Oil Spot Prices to Platts**

61.    Defendants conspired to fix, maintain, raise and/or artificially inflate, and intentionally manipulated, the prices of Brent Crude Oil and Brent Crude Oil futures contracts through their collusive, deliberate and systematic submission of false Brent Crude Oil trade information to Platts. Defendants knew that this false trade information was used by Platts in calculating and publishing its Brent Crude Oil prices. Further, they also knew, as sophisticated

- 18 -

market participants, that the deceptive information they reported impacted the prices of Brent Crude Oil futures contracts and other Brent Crude Oil derivative contracts traded in the U.S. to the detriment of Plaintiff and Class members.

## CLASS ACTION ALLEGATIONS

62.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on his own behalf and as a representative of the following Class:

> All persons or entities (other than Defendants and any parent, subsidiary, affiliate, or agent of any Defendant, the United States Government, and any state government) that purchased or sold a Brent Crude Oil futures contract on the NYMEX or ICE during the period of at least 2002 through the present.

63.     The Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of geographically dispersed Class members transacted in Brent Crude Oil futures contracts during the Class Period.

64.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

65.     Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is an adequate representative of the Class and has no interests which are adverse to the interests of absent Class members. Plaintiff has retained counsel competent and experienced in class action litigation, including commodity futures manipulation and antitrust class action litigation.

- 19 -

66.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. These common questions of law and facts include, without limitation:

(a)     Whether Defendants manipulated Brent Crude Oil futures contracts in violation of the CEA;

(b)     Whether such manipulation caused Brent Crude Oil futures contracts to be artificial;

(c)     Whether such manipulation caused cognizable legal injury under the CEA;

(d)     Whether Defendants unlawful acts violate Section 1 of the Sherman Act;

(e)     Whether Defendants attempted to monopolize and/or did monopolize the market for North Sea Brent Crude Oil;

(f)     Whether Defendants' unlawful conduct caused injury to the business or property of Plaintiff and the Class;

(g)     Whether Defendants were unjustly enriched at the expense of Plaintiff and members of the Class;

(h)     The operative time period and extent of Defendants' foregoing violations; and

(i)     Whether such injury or the fact or extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests.

67.     A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that

numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

68.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

69.     By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing. Defendants, *inter alia*, falsely reported prices and volume and trade information to Platts in order to manipulate the spot price for Brent Crude Oil and the prices of Brent Crude Oil Futures contracts traded on the NYMEX and ICE.

70.     Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until it became public. The first public reports of any government action relating to Defendants' unlawful conduct occurred on or about May 14, 2013, when the European Commission confirmed that it carried out unannounced inspections at the premises of several companies active in and providing services to the crude oil, refined oil products and biofuels sectors, alleging that these companies colluded in reporting artificial prices to a PRA to manipulate the published prices for a number of oil and biofuel products.

71.     Because the Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiff and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure in May 2013.

- 21 -

72.     Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

## COUNT I

**Manipulation in Violation of the Commodity Exchange Act, 7 U.S.C. §§1, *et seq.***

73.     Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

74.     By their misconduct, the Defendants each violated Section 9(a)(2) of the Act, 7 U.S.C. §9(a)(2), and caused prices of Brent Crude Oil futures contracts to be artificial, during the Class Period.

75.     Defendants' trading and other activities alleged herein constitute **market power** manipulation of the prices of Brent Crude Oil futures contracts in violation of Sections 9(a) and 25(a) of the CEA, 7 U.S.C. §§13(a) and 25(a).

76.     Defendants' foregoing extensive manipulative conduct deprived Plaintiff and other traders of a lawfully operating market during the Class Period.

77.     Plaintiff and others who transacted in Brent Crude Oil futures contracts during the Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the Commodity Exchange Act, 7 U.S.C. §1, *et seq.*, and as a direct result thereof were injured and suffered damages.

78.     Plaintiff and the Class are each entitled to damages for the violations of the CEA alleged herein.

79.     Plaintiff and members of the Class who purchased or sold NYMEX Brent Crude Oil futures contracts during the Class Period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

## COUNT II

### Aiding and Abetting Manipulation in Violation of the
### Commodity Exchange Act, 7 U.S.C. §§1, *et seq.*

80.    Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

81.    Defendants knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein. Defendants did so knowing of each other's manipulation of Brent crude oil market prices, and willfully intended to assist these manipulations, which resulted in Brent Crude Oil futures contracts to reach artificial levels, during the Class Period in violation of Section 25(a)(l) of the CEA, 7 U.S.C. §25(a)(l).

82.    Plaintiff and members of the Class are each entitled to actual damages sustained in trading Brent Crude Oil futures contracts as a result of the CEA alleged herein.

## COUNT III

### Principal-Agent Liability in Violation of the
### Commodity Exchange Act, 7 U.S.C. §§1, *et seq.*

83.    Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

84.    Each Defendant is liable under Section 2(a)(l)(B) of the CEA, 7 U.S.C. §2(a)(l)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

85.    Plaintiff and members of the Class are each entitled to actual damages sustained in trading Brent Crude Oil futures contracts as a result of the violations of the CEA alleged herein.

## COUNT IV

### Violations of Section 1 of the Sherman Act, 15 U.S.C. §1, *et seq.*

86.     Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

87.     Defendants entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

88.     The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, suppressed and/or made artificial Brent Crude Oil market prices and the prices of Brent Crude Oil futures contracts.  Defendants' conspiracy is a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

89.     Defendants' conspiracy, and resulting impact on Brent Crude Oil market prices and the prices of Brent Crude Oil futures contract, occurred in or affected interstate and international commerce.

90.     As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.

91.     As a consequence, Plaintiff and the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

## COUNT V

### Unjust Enrichment

92.     Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

93.     Defendants financially benefited from their unlawful acts described herein, including but not limited to fixing, raising, maintaining and/or artificially inflating prices in restraint of trade in, and intentional manipulation of, the market for Brent Crude Oil and the prices of Brent Crude Oil futures contracts traded on NYMEX and ICE, and intentionally reporting inaccurate, false and deceptive information regarding Brent Crude Oil prices to Platts.  These unlawful acts caused Plaintiff and other members of the Class to suffer injury, lose money, and transact in Brent Crude Oil futures contracts at artificial prices.

94.     As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner.

95.     Each Defendant, in equity and good conscience, should pay restitution or its own unjust enrichment to Plaintiff and members of the Class.

96.     Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

## PRAYER FOR RELIEF

Accordingly, Plaintiff demands relief as follows:

A.      For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative, and his counsel be appointed as Class counsel;

B.      For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

C.      For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act:

D.      For Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or

claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

E.     For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

F.     For a judgment awarding Plaintiff and the Class restitution of any and all sums received by the Defendants' unjust enrichment;

G.     For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

H.     For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury of all issues so triable.

DATED: June 10, 2013            ROBBINS GELLER RUDMAN
                                 & DOWD LLP
                                SAMUEL H. RUDMAN
                                ROBERT M. ROTHMAN

                                SAMUEL H. RUDMAN

                                58 South Service Road, Suite 200
                                Melville, NY  11747
                                Telephone:  631/367-7100
                                631/367-1173 (fax)
                                srudman@rgrdlaw.com
                                rrothman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BONNY E. SWEENEY
DAVID W. MITCHELL
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
bsweeney@rgrdlaw.com
davidm@rgrdlaw.com

*Counsel for Plaintiff*